UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


DONALD R. HULL,                        :
                                       :
            Plaintiff                  :
                                       :
      v.                               :  CIVIL NO. 3:CV-03-1524
                                       :
FRANK D. GILLIS, et al.,               :  (Judge Kosik)
                                       :
            Defendants                 :


**M E M O R A N D U M**

### I.   Introduction

      Donald R. Hull, an inmate currently confined at the State Correctional Institution at

Fayette, Pennsylvania, initiated this civil rights action pursuant to 42 U.S.C. § 1983 on

September 2, 2003.  The matter proceeds on an amended complaint submitted by Hull on

October 10, 2003.  There are twenty-five (25) named defendants which include present or

former employees at the State Correctional Institution at Coal Township ("SCI-Coal"), Hull's

former place of incarceration, as well as current or former employees of the Pennsylvania

Board of Probation and Parole ("the Board").  Also named are Jeffrey A. Beard and Donald

A. Kelchner, Department of Corrections ("DOC") officials.   In the complaint Hull contends

that his constitutional rights were violated when: (1) he was continuously denied parole

staffings and the opportunity to be heard; (2) he was deprived of a fair parole hearing due to

prejudicial and discriminatory information placed in his institutional record[1]; (3) the Ex Post

---

[1]  Specifically, Hull claims that his mandatory participation in institutional programs
was not part of his criminal sentence and therefore any reference to his refusal to participate

Facto clause was violated because the Parole Board retroactively applied the 1996 amendment to the Parole Act to his October 2001 and October 2002 applications for parole; and (4) defendants retaliated against him for seeking redress regarding his claims by transferring him from one cell block to another, denying him access to the courts and threatening him.

Currently pending is defendants' unopposed motion for summary judgment (Doc. 64) filed on October 4, 2004.  Despite a lengthy period of discovery in this matter and the grants of enlargements of time within which to oppose the motion, no opposition to the motion has been submitted nor have any further requests for additional time to respond to the motion been made.[2]  As such, the motion for summary judgment will be deemed unopposed and addressed on the merits.  For the reasons that follow, the motion for summary judgment will be granted.

---

in the Sex Offenders program or Drug and Alcohol programs was improper.  He further claims that early in his incarceration, he did participate in a Drug and Alcohol program.

[2] On March 9, 2006, the court issued a Memorandum and Order addressing discovery issues and directing Hull to file his opposition to the summary judgment motion within 45 days.  He was instructed to file his opposing brief, statement of material facts and any evidentiary materials.  (Doc. 100.)  He was further advised that his failure to do so would result in the motion being deemed unopposed.  Within the 45 day period, Hull did file a motion to exceed the page limitations which was granted on March 22, 2006.  (Doc. 103.) On the same date, he filed a motion for extension of time to file his opposition to the summary judgment motion.  This motion was granted on March 23, 2006, in an Order wherein the court granted Hull an additional 60 days within which to submit his opposition. (Doc. 104.)  The deadline for filing opposition has long expired.

2

## II.    Allegations in the complaint

Hull states that he was sentenced on November 18, 1993 to 8-20 years in prison for aggravated assault and involuntary sexual intercourse.  He contends that his participation in institutional programs as a requirement for parole was not made a part of his sentence by the judge.  Hull states that during the time period following his transfer to SCI-Coal on February 20, 2001, and continuing through September of 2001, he made requests to numerous defendants for a parole staffing in light of a parole hearing he had scheduled for August 13, 2001.  Despite his requests, defendants Krum, Rodgers, Williams and Augustine failed to schedule the parole staffing.  Hull further contends that he was subject to retaliation for seeking redress with regard to the parole staffing issue.  He claims he was transferred to the "east side" of the prison, called names and deprived access to the law library.  He contends he also informed Defendants Gillis, Johnson, Lane and Kaskie that he never received a parole staffing, yet he continued to be deprived of a staffing and was subjected to further retaliation.

On October 1, 2001, Hull was seen by defendant Stout, a parole supervisor, and informed him that he never received a parole staffing by defendant Krum, the parole agent.  On October 2, 2001, Hull states that he was seen by the Parole Board with respect to his minimum parole eligibility, but that he had never first been provided with an opportunity to be heard at a parole staffing.  On October 23, 2001, Hull received a decision from the Board denying parole based upon reasons he states did not apply to him.  He contends that this hearing was invalid since he never received the parole staffing.

On November 1, 2001, Hull states he was given notice regarding an assessment for participation in a Drug and Alcohol program on November 8, 2001.  He did not participate in the program claiming that he had participated in a program at SCI-Mahanoy while he was there.  Defendant Littel informed Hull that he would have to provide a copy of the certificate from that program.  In late November of 2002, he was again reviewed by the Parole Board and was denied parole.  Hull contends that this denial violated the Ex Post Facto clause and was improperly based upon his failure to complete a sex offender program.

In December of 2002, Hull was transferred to the State Correctional Institution at Laurel Highlands where he also refused to participate in the Drug and Alcohol Program.  He was ultimately transferred back to SCI-Coal due to his refusal to participate in institutional programs.  Hull was again provided with notice for a Drug and Alcohol assessment in the months of May and August of 2003 by defendant Nesbitt.  On August 20, 2003, Nesbitt placed Hull on the mandatory attendance list for the program and Hull contends that this was an abuse of authority.  Hull filed a grievance with regard to this issue and claims he was thereafter subjected to retaliation in the form of the denial of basic personal hygiene necessities and threats by defendant Chismar.  Hull seeks relief in the form of monetary damages.

## III.    Motion for Summary Judgment Standard

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact.  Fed. R.

Civ. P. 56(c).  An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. Forms, Inc. v. American Standard, Inc., 546 F. Supp. 3145, 320 (E.D. Pa. 1982). Upon such a showing, the burden shifts to the nonmoving party. Id. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988).  In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  Id. (citations omitted).

Hull has failed to oppose defendants' pending motion for summary judgment.  As such, the motion is deemed unopposed.  Moreover, since Hull has failed to file a separate statement of material facts controverting the statement filed by defendants, all material facts set forth in defendants' Statement of Material Facts (Doc. 70) will be deemed admitted. See M.D. Pa. Local Rule 56.1.[3]

---

[3] M.D. Pa. Local Rule 56.1 provides in relevant part as follows: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

## IV.    Discussion

### A.    Undisputed Facts

Defendants' statement of material facts and supporting documentation[4] indicates that Hull has a history of arrest prior to 1985 on such charges as Receiving Stolen Property, Simple Assault, Burglary, Terroristic Threats and Possession of an Instrument.  In November of 1993, he was sentenced to serve two concurrent terms of 8 to 20 years following pleas of guilt to Involuntary Deviate Sexual Intercourse and Aggravated Assault.  His minimum sentence date is August 14, 2001, and his maximum sentence date is August 14, 2013. Following several transfers from different prisons, he arrived at SCI-Coal on February 20, 2001.  In December of 2002, he was transferred to SCI-Laurel Highlands and then back to SCI-Coal in April of 2003.

Upon incarceration, a correctional plan or prescriptive treatment program is developed for an inmate based upon their initial classification and summary evaluations.  Factors considered in formulating a plan or treatment program include the underlying offense and criminal history, social and educational assessment, drug and alcohol history and pre-sentencing investigations and reports.  (Doc. 70, Ex. B, ¶ 5.)  Inmates serving prison terms

---

[4]  The evidentiary materials submitted by defendants include declarations made under penalty of perjury by the following individuals: Allen Castor, Parole Board member (Doc. 70, Ex. A); Linda Chismar, SCI-Coal Deputy Superintendent (Id., Ex. B); Kandis Dascani, SCI-Coal Assistant to the Superintendent (Id., Ex. C); Deborah Klum, former Parole Board employee (Id., Ex. D); Kristen P. Reisinger, Assistant Chief Grievance Coordinator in the Secretary's Office of Inmate Grievances and Appeals at the DOC (Id., Ex. E); Brian Stout, Parole Board employee (Id., Ex. F); and Michael Vuksta, Unit Manager at SCI-Mahanoy (Id., Ex. G).  Also submitted in support of the motion for summary judgment is Hull's deposition transcript (Id., Ex. H).

related to sex offenses are prescribed the Sex Offenders Program ("SOP") as part of their plan. (Id., ¶ 6.)  The SOP is made up of three phases, and only those successfully completing the first two phases can participate in the final phase.  Likewise, inmates serving prison terms related to drug and alcohol abuse or who have a history of the same are prescribed the Alcohol and Other Drug Program ("AOD') as part of their correctional plan.  (Id., ¶ 8.) An inmate must attend an AOD assessment before any recommendation is made as to AOD programming.  (Id., ¶ 9.)  Because of the nature of Hull's charges and his history of drug and alcohol abuse, his correctional programming included participation and completion of the sex offenders program and the drug and alcohol abuse programs.  (Id., ¶ 10.)  According to Hull's institutional records, he only completed Phase I of the SOP program and Drug and Alcohol education.  (Id., ¶ 15.)  As such, Hull did not complete his correctional plan.

Prior to an inmate's consideration for parole by the Board, the staff at the correctional institution where an inmate is confined conducts a staffing for parole review.  Institutional staff such as unit managers, counselors and psychologists participate in the review.  (Doc. 70, Vuksta Decl., Ex. G at ¶ 4.)  Various records reviewed include an inmate's conduct and educational records, work records, medical records, staff evaluations and pre-release reports. Following the staffing, a recommendation is made by prison personnel regarding the inmate's parole.  The inmate is informed of the staff's recommendation.  (Id. at ¶¶ 5, 6.)  Although inmates may attend, there is no DOC policy that exists which requires an inmate's presence at a parole staffing review.  Due to safety concerns in the Restricted Housing Unit ("RHU") at SCI-Mahanoy, inmates housed there are not routinely present for parole staffing reviews. (Id., ¶ 7.)

On January 31, 2001, Hull was placed in the RHU at SCI-Mahanoy and confined there pending transfer to another institution due to inmate separation and safety concerns.  (Id., ¶ 8.)  The SCI-Mahanoy staff conducted a staffing for parole review regarding Hull on February 12, 2001.  Because of safety concerns in the RHU, Hull was not present for the review.  (Id., ¶ 9.)  Following a review of the institutional record and reports, the SCI-Mahanoy staff unanimously voted against recommending parole for Hull at the expiration of his minimum sentence.  Reasons provided to support this decision were the seriousness of Hull's crime, his institutional misconducts and his failure to complete the Sex Offenders Program.  Hull was also advised of this recommendation.  Hull was thereafter transferred to SCI-Coal on February 20, 2001. (Id., ¶ 10.)  Upon arrival at SCI-Coal, Hull voiced complaints that he was never staffed for parole while at SCI-Mahanoy.  Staff at SCI-Coal informed Hull several times that he had been given a staffing while at SCI-Mahanoy.  (Doc. 70, Ex. B, ¶ 16.)

On April 1, 2001, Hull filed a grievance (#0273-01) alleging the denial of access to the courts because SCI-Coal business managers would not provide him with free writing materials beyond the DOC authorized allocations set forth in DC-ADM 803.  (Doc. 70, Dascani Decl., Ex. C at ¶ 11.)  Grievance Coordinator Dascani responded to the grievance informing Hull that he had received more free writing materials than permitted.  No appeal was pursued from this response.

On July 15, 2001, Hull filed a grievance (#0598-01) alleging that he was being deprived of access to the courts because Mr. Voeckler refused to exceed the $10.00 legal mail limit under DC-ADM 803.  Dascani responded to the grievance on July 20, 2001

8

informing Hull he had already exceeded the limits for said month.  Hull did not pursue an appeal as required under DC-ADM 804.  (Id., Ex. D, ¶ 15; Ex. E, ¶ 12.)

On July 26, 2001, another grievance (#0622-01) was filed by Hull.  Hull alleged that his Inmate Request Slips wherein he requested to go to the Law Library and notary services, were not delivered to the appropriate staff.  (Id., Ex. D, ¶ 16.)  Defendant Kaskie responded to the grievance on August 13, 2001, informing Hull that Inmate Request Slips are delivered to the appropriate staff each day and that he could not ascertain what had happened with the particular slips referenced.  Again, no appeal was pursued by Hull from the response to this grievance.  (Id., Ex. C, ¶ 17, Ex. E, ¶ 13.)

Hull wrote a letter to Deputy Superintendent Lane on August 13, 2001 stating that he was never staffed for parole at SCI-Mahanoy and attached the letter to an Informal Request to Staff Member.  A copy of the letter was also sent to Superintendent Gillis.  (Id., Ex. C, ¶ 18; Ex. J at p. 49.)  Kaskie responded to the Informal Request and again Hull was informed that he was staffed for parole at SCI-Mahanoy on February 12, 2001.  He was further informed that his parole paperwork had been completed at SCI-Mahanoy and given to the parole department at SCI-Coal.  (Id., Ex. C, ¶ 19; Ex. J pp. 49-50.)  No formal grievances were filed by Hull regarding his parole staffing issue at SCI-Mahanoy.

On September 4, 2001, Hull filed another grievance (#3850) contesting his move from one housing unit to another (Unit E to Unit B) and claimed that his prison job was taken in retaliation for filing complaints against E-Block's Unit team.  In the grievance, Hull requested to be moved to a smoking block.  (Id., Ex. C, ¶ 21.)  Shortly thereafter, an Inmate Request to Staff Member was submitted by Hull alleging that Unit Manager Chesney refused

to move him to an empty cell on Block B. Hull wrote a complaint to defendant Lane on

September 20, 2001, alleging that Cheney refused to move him into an empty cell, and

requesting to be moved to another cell block.  (Id., ¶ 22.)  A response to the complaint was

issued the following day by Major Varano informing plaintiff that there is no obligation to

move inmates into unoccupied cells.  Varano responded to grievance #3850 on September

25, 2001 informing Hull that he made the request to be moved from Unit EB and that to

accommodate the request and his desire to be in a non-smoking unit, he was moved to Unit

BA.  If Hull now wanted to be on a smoking unit, he would have the option not to renew his

non-smoking contract at his Annual Review.  No appeal to this response was filed by Hull.

(Id., Ex. C, ¶ 23; Ex. E, ¶ 14.)

With regard to the issue of parole, defendants state that prior to an inmate's

consideration by the Board, parole agents assigned to the state prison where an inmate is

incarcerated conduct a parole summarization review.  During the review, many factors are

considered such as the criminal charges and sentence being served, whether there is a parole

recommendation by the DOC, drug and alcohol history, physical and mental health and

institutional programming.  Also considered is the parole planning submitted by an inmate to

the prison parole agents.  (Doc. 70, Castor Declar., Ex. A ¶ 3; Krum Declar., Ex. D ¶4; Stout

Declar., Ex. F ¶ 4.)  There is no Parole Board requirement that an inmate be present for the

parole summarization review.  Further, inmates may decline or refuse to attend the reviews.

Following the review, a Summarization Report is submitted to the Board prior to the Board's

consideration of the inmate for parole.  The parole agents at the prison make no

recommendation as to whether an inmate should be granted or denied parole. (Id., Ex. A ¶ 4; Ex. D ¶ 5; Ex. F ¶ 5.)

Due to security concerns and the efficient use of parole agents' time, inmates are scheduled to appear for their parole summarization review at a set time and in a designated area of the prison. An inmate must alert DOC staff in a timely manner to assure he is on time for the review. If he does not appear, the review may be held in his absence. Also, if the inmate refuses to attend or is housed in the RHU, the parole summarization review is conducted in his absence. The institutional file information is utilized in preparing the summarization report. (Id., Ex. F ¶ 6.)

On September 24, 2001, Hull was reviewed for parole by agent Krum. He failed to appear as scheduled for the pre-parole interview and his summarization review was prepared from the information contained in his institutional records. (Id., Ex. D ¶ 8; Ex. F   ¶ 7.) According to these records, Hull did not complete his prescribed DOC programming which included the Sex Offenders Treatment Program. Further, the DOC did not recommend Hull for parole at the expiration of his minimum sentence. At no time did Krum remove or falsify any of the documents contained in Hull's DOC files. Based upon this information Krum prepared the Parole Summarization Report on September 26, 2001. (Id., Ex. D ¶ 10; Ex. F ¶ 8.)[5]

---

[5] On October 2, 2001, Hull was interviewed by a Board member and a Board Hearing Officer. Hull was questioned as to his participation in institutional programs and, at this time, had only completed drug and alcohol education, not the Sex Offenders Program. (Doc. 70, Ex. A ¶ 28; Ex. B ¶ 15; Ex. J at 68.)

On September 24, 2001, Hull filed grievance #4865 complaining that on said date he was scheduled to see Krum at 11:30 and that when he arrived at the meeting Krum ordered him to be returned to his housing unit.  (Id., Ex. C ¶ 24.)  This grievance was responded to on October 3, 2001 by Dascani who informed Hull that he is required to complete Block B on the grievance form.  He was further advised to address this issue with Mr. Stout.  (Id., Ex. D ¶ 25.)  Hull neither resubmitted his form nor appealed grievance # 4865, and did not file another grievance regarding the meeting scheduled with Krum on September 24, 2001.  (Id., Ex. D ¶ 24; Ex. E ¶ 25.)

On October 10, 2001, following an interview with Hull and a review of his file, the Board determined that the fair administration of justice could not be achieved through his release on parole.  He was scheduled for a review in or after October, 2002.  It was further noted by the Board that at the next interview Hull's file would be reviewed and they would consider whether he had participated in a sex offenders and substance abuse program, received a favorable DOC recommendation and maintained a clear conduct record as well as completed the DOC prescriptive programs. (Id., Ex. A ¶ 28; Ex. C ¶ 17; Ex. E ¶ 9; Ex. D ¶ 11.)

Despite the amendment to the Probation and Parole Law in 1996, the Board never interpreted the amendment to affect its parole decision-making authority or interpret the amendment regarding the declaration of public policy to in any way increase the likelihood that the Board would refuse parole to any offender.  (Id., Ex. A ¶ 7.)  The Board interprets the amendment as only a reemphasis of the pre-existing consideration of public safety in considering parole and not a change as to which offenders should be paroled and when.   (Id.

at ¶¶ 9, 10.)  The Board has implemented no new criteria in the parole decisionmaking process because of the 1996 amendment. (Id. at ¶ 11.)

Prior to Hull's October 2002 review by the Board, the SCI-Coal staff reviewed Hull regarding a parole recommendation.  On July 15, 2002, a confidential parole review summary was conducted and Hull refused to attend.  (Ex. C ¶ 18.)  His institutional record and reports from SCI-Coal staff members were reviewed.  At that time, Hull had completed Phase I of the Sex Offenders Program as well as drug and alcohol education.  His reports revealed that he did not attend the SOP and as such had not completed the entire program. The SCI-Coal staff unanimously voted against recommending parole.  Hull was notified of this recommendation.  (Ex. C ¶ 19.)

In October of 2002, a parole summarization review was conducted and Hull was present.  The Summarization Report reveals that the institutional records demonstrated that Hull had not completed the DOC programming, including the SOP, and the DOC did not recommend Hull for parole.  This report was signed by Defendant Stout, Parole Board Supervisor.  (Ex. F ¶ 10.)  On October 23, 2002, Hull was interviewed by a Board Member and a Board Hearing Officer.  The Board again refused to grant Hull parole.  The following reasons were given in support of the refusal: refusal to accept responsibility for the offenses committed; the recommendation made by the DOC; unacceptable compliance with prescribed institutional programs; and Hull's need to participate in and complete additional institutional programs. Hull was to be reviewed and considered again for parole in November of 2005. (Ex. A ¶ 28; Ex. B ¶ 20; Ex. F ¶ 11.)

On December 17, 2002, Hull was transferred from SCI-Coal to SCI-Laurel Highlands. On March 20, 2003, he was transferred to SCI-Somerset. He was thereafter transferred back to SCI-Coal on April 22, 2003. The reason for the transfer back to SCI-Coal was because Hull was non-compliant with recommended programs and needed more secure housing. (Ex. B ¶ 21; Ex. C ¶ 27.) Upon his return to SCI-Coal, Hull was placed on the callout sheet for appointments regarding Drug and Alcohol Assessments on May 13, May 21, May 28, August 8 and August 23, 2003. He refused to attend any of these appointments. (Ex. B ¶ 22.)

Hull received a misconduct (#A320224) on May 19, 2003 for Refusing to Obey an Order. He pled guilty and was sanctioned to 30 days in disciplinary custody in the RHU. (Ex. C ¶ 28.) On June 8, 2003, Hull filed a grievance (#53898) alleging that RHU Officer Minor was denying him access to the courts because he did not provide him with the number of cash slips and prepaid envelopes requested. On June 10, 2003, Hull received a response to this grievance from Lt. Mann informing him that Minor acted appropriately in refusing him additional envelopes as he had exceeded the monthly limit as per DOC policy. Further, he could be issued more cash slips once he turned in the slips he had already been provided. (Ex. C ¶ 29.) This response was appealed by Hull to Superintendent Gillis who affirmed the response given by Mann. No further appeal was taken by Hull to the DOC Central Office. (Id. ¶ 30; Ex. E ¶ 18.)

Another grievance (#60078) was filed by Hull on August 19, 2003, alleging that the mandatory call out for the Drug and Alcohol Assessment amounted to unconstitutional oppression, tampering with records and an abuse of authority. In addition, a formal complaint was filed with defendant Chismar. (Ex. B ¶ 23; Ex. C ¶ 31.) On August 20, 2003,

Hull was placed on unassigned status (removed from idle pay status) pursuant to DC-ADM 816 for failing to be compliant with institutional programming.  (Ex. B, ¶ 24.)

On August 22, 2003, Chismar responded to grievance # 600087 informing Hull that he was placed on the call out list for Alcohol and Drug Assessment according to his Correctional Plan.  He was informed that it was referred to as "mandatory" so that inmates do not go elsewhere and those who constantly fail to show up respond.  Chismar noted the dates that Hull failed to respond to the mandatory assessments and stated that he would not be scheduled again until he agreed to be compliant.  Due to his refusal to participate in the programs, Chismar noted that Hull would not be eligible to receive his daily allowance and AOD Supervisor Mull requested that he be placed on unassigned status.  (Ex. B ¶ 26; Ex. C ¶ 33.)  While an appeal filed from this response was affirmed by Superintendent Gillis, no further appeal was taken.

Another grievance was filed by Hull on August 24, 2003 (#60450) alleging that his idle pay was stopped in retaliation for filing grievance #60087.  This grievance was denied by Chismar for the reasons stated above.  No appeal was taken by Hull.  (Ex. C ¶ 35; Ex. E ¶ 20.)

Hull submitted Inmate Request Slips to Chismar on January 25 and 26, 2004, questioning when the Alcohol and Drug and Sex Offenders Programs became mandatory.  Chismar informed Hull on January 27, 2004, that the only program he did not have to complete was Act 143, and that he was non-compliant with AOD because he refused the evaluation.  Once he agreed to be evaluated, his daily allowance would be reinstated.  He was further informed that because he refused to attend the evaluation, he could not receive back

pay. No formal grievance was filed with regard to this response. (Ex. B ¶¶ 29, 30; Ex. D ¶¶ 36, 37.)

An Inmate Request Slip was submitted to Mr. Sidler on January 26, 2004, regarding the Sex Offenders Program. Sidler replied on January 27, 2004, informing Hull that such programming was required because his current offense is a sexual offense and his counselor indicated such programming in his correctional plan. A second Inmate Request Slip was submitted to Sidler on February 16, 2004, regarding the SOP and Hull's contention that his counselor had no authority to recommend such programming. On February 17, 2004, Sidler again responded to Hull by explaining why such program was required for him. No formal grievance was filed by Hull with respect to the SOP issue.

On September 17, 2004, the Parole Board again refused Hull parole. The following reasons for the decision were given: refusal to accept responsibility for the offenses committed and the recommendation made by the DOC. It was further noted by the Board that at Hull's next interview the following would be considered: whether Hull has participated in/successfully completed a treatment for sex offenders; whether he has received a favorable recommendation for parole from the DOC; whether he has received a clear conduct record; and whether he had completed the DOC prescriptive programs. (Ex. A ¶ 32; Ex. C ¶ 33.)

**B.** **Analysis of Claims**

**1.** **Statute of Limitations**

As argued by defendants, all claims set forth by Hull in the amended complaint arising before September 9, 2004 are barred by the applicable statute of limitations. In reviewing the

applicability of the statute of limitations to an action filed pursuant to § 1983, a federal court

must apply the appropriate state statute of limitations which governs personal injury actions.

Wilson v. Garcia, 471 U.S. 261, 276 (1985); Urrutia v. Harrisburg County Police Dept., 91

F.3d 451, 457 n. 9 (3d Cir. 1996); Cito v. Bridgewater Twp. Police Dept., 892 F.2d 23, 25

(3d Cir. 1989).  The United States Supreme Court clarified its decision in Wilson when it

held that "courts considering § 1983 claims should borrow the general or residual [state]

statute for personal injury actions."  Owens v. Okure, 488 U.S. 235, 250 (1989); Little v.

Lycoming County, 912 F. Supp. 809, 814 (M.D. Pa), aff'd 101 F.3d 691 (3d Cir. 1996)

(Table).  Pennsylvania's applicable personal injury statute of limitations is two years.  See 42

Pa. Cons. Stat. Ann. § 5524(7); Kost v. Kozakiewicz, 1 F.3d 176, 190 (3d Cir. 1993); Smith

v. City of Pittsburgh, 764 F.2d 188, 194 (3d Cir.), cert. denied, 474 U.S. 950 (1985).  Finally,

the statute of limitations "begins to run from the time when the plaintiff knows or has reason

to know of the injury which is the basis of the Section 1983 action."  Gentry v. Resolution

Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991)(citations omitted).

Those claims of Hull's which involve events that took place prior to September 2,

2001 are subject to dismissal because they are untimely.  These claims include those that

plaintiff was not staffed for parole review at SCI-Mahanoy; his claims that he placed SCI-

Coal Township defendants on notice in May and August 2001 that he was not staffed for

parole at SCI-Mahanoy and his claims that he was retaliated by the SCI-Coal defendants

because he was transferred from one cell block to another or denied access to the court in the

summer of 2001.

### 2.      Presence at Parole Staffing / Parole Summarization Review

Hull contends that his Fourteenth Amendment right to procedural due process was

violated because he was not present during DOC staffings for parole review/Parole

Summarization Reviews.  Any challenges to the reviews which took place at SCI-Mahanoy

in February of 2001 are clearly barred by the statute of limitations.  With regard to claims

involving post-September 2, 2001, his claims are without merit.

It is well-established that there is no constitutional right or inherent right of a

convicted person to be conditionally released before the expiration of their sentence.  See

Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979);

Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).  While "[s]tates may under certain

circumstances create liberty interests which are protected by the Due Process Clause," see

Sandin v. Conner, 515 U.S. 472, 483-84 (1995), the Pennsylvania Supreme Court has long

held that a denial of parole does not implicate a constitutionally protected liberty interest as

parole is a matter of grace and mercy granted to a prisoner who has demonstrated his ability

to function in society as a law-abiding citizen.  See Coady v. Vaughn, 564 Pa. 604, 770 A.2d

287, 291 (2001); Rogers v. Pa. Bd. of Prob. & Parole, 555 Pa. 285, 724 A.2d 319 (Pa. 1999).

To determine whether a due process violation has occurred, it must be determined

whether a protected liberty interest exists and, if so, what process is mandated to protect it.

See Sandin v. Conner, 515 U.S. 472, 484 (1995); Shoats v. Horn, 213 F.3d 140, 143 (3d Cir.

2000).  In Sandin, the Supreme Court established a "standard for determining whether prison

conditions deprive a prisoner of a liberty interest that is protected by procedural due process

guarantees." Shoats, 213 F.3d at 143.  It held that due process requirements would only

apply where the prison's actions impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483. Hull can point to no such hardship in the instant case. In each instance, Hull received a hearing before the Parole Board itself with regard to his consideration for release on parole. While he complains that he was not present for parole staffings/summarization reviews at the prison which took place prior to the Parole Board hearings, Hull has no right to pre-parole process. As such, since Hull has no constitutionally protected liberty interest in being paroled, any due process claim with regard to pre-parole staffings/summarization reviews fails. Accordingly, defendants are entitled to summary judgment with regard to these claims.[6]

**3.     Institutional Programming/Correctional Plan**

Hull contends that his Eighth and Fourteenth Amendment rights were violated because his correctional plan included the Sex Offenders Treatment Program and the Alcohol and Drug Program. It appears to be Hull's claim that the inclusion of these programs violates his rights because participation in the programs was not included by the judge when he imposed Hull's criminal sentence. While Hull is correct in that participation in the Sex Offenders and Alcohol and Drug programs was not part of his criminal sentence, prison officials have discretion to require programming for inmates as part of the day-to-day management of prisons. In requiring program participation, an inmate's sentence is in no

---

[6] The court further notes that the undisputed record reveals that Hull failed to appear for his parole summarization review before Defendant Krum on September 24, 2001, which preceded his Parole Board hearing of October 2001. Further, with regard to the October 23, 2002 Parole Board hearing, the record demonstrates that Hull refused to attend his parole staffing but did attend his parole summarization review with regard to the October 2002 hearing.

way extended or considered "double" punishment.  Hull's imposed term of incarceration is not in any way lengthened by requiring him to participate in institutional programming. Further, Hull is not deprived of consideration for parole.[7]  See McKune v. Lile, 536 U.S. 24, 38 (2002).  The undisputed record establishes that Hull was considered for release on parole on October 2, 2001 and October 23, 2002.  While parole was denied on each of these occasions, the reasons for the denials were not exclusively based upon his failure to complete institutional programs.  While the Parole Board stated that it would consider whether Hull successfully completed the sex offender programs, this was only one factor that was to be considered in making a parole determination.  Thus, the decision to deny parole was not solely based upon the failure to complete the programs.  As such, summary judgment in favor of Defendants is warranted on these claims as well.

### 4.    Ex Post Facto Claim

Hull further contends that the Parole Board retroactively applied the 1996 amendment to the Parole Act to his October, 2001 and October, 2002 applications for parole.  As relief he seeks an immediate parole hearing and damages because he did not have a fair Board hearing prior to his parole considerations.  (Doc. 9, Compl. ¶¶ 44, 45 and 97.)

The Ex Post Facto Clause, U.S. Const. Art. I, § 10, cl. 1, bars a change in law that retroactively increases the punishment for a crime after its commission.  Garner v. Jones, 529 U.S. 244, 249-50 (2000).  The clause covers a change in state regulatory rules, even if the rules deal with an agency's substantive discretion in making the decision to parole.  Id. at

---

[7] As discussed above, Hull has no constitutional right to be released from prison prior to the expiration of his sentence.

250, 253, 255.  The ex post facto issue in this context is one of "particular difficulty," given the paroling agency's discretion.  Id. at 250.  Nonetheless, if the change in the law, "either on its face, or in its practical implementation, creates a significant risk of increasing [the inmate's] punishment in comparison to the previous rule, the Ex Post Facto Clause forbids its enforcement against the inmate."  Id. at 255.

In 1996, the Pennsylvania legislature amended a section of its parole law, stating the public policy of the Commonwealth toward parole.  In pertinent part, the amendment changed the statutory section as follows: "the board shall first and foremost seek to protect the safety of the public."  61 P.S. §331.1 (Purdon's 1999).[8]  Before then, section 331.1 made no mention of public safety and in fact declared the public policy of the state to be that parole would be a period of rehabilitation of an inmate and his restoration to society, aided and facilitated by the parole administration.[9]

---

[8] After amendment, section 331.1 reads in full:

> The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.
>
> In providing these benefits to the criminal justice system, the board shall first and foremost seek to protect the safety of the public.  In addition to this goal, the board shall address input by crime victims and assist in the fair administration of justice by ensuring the custody, control and treatment of paroled offenders.

61 P.S. § 331.1 (Purdon's 1999).

[9] Formerly, section 331.1 read as follows:

Applying the ex post facto principles set forth above, the Third Circuit ruled in

Mickens-Thomas v. Vaughn, 321 F.3d 374 (3d Cir. 2003), that the board had violated

petitioner Mickens-Thomas's ex post facto rights by refusing him parole after his life

sentence for murder had been commuted by the governor.  The court found that the 1996

change to section 331.1 had prompted the Board to adopt policies that made public safety the

predominant concern in making parole decisions.  Before this change public safety had been

just one factor, among others, to be considered. Id. at 385.  Further, the change had increased

Mickens-Thomas's punishment, as shown in part by the fact that parole guidelines and other

criteria in effect before the 1996 amendment indicated that parole should have been granted.

Id. at 387-88.  The court of appeals ordered that the Board review Mickens-Thomas under

pre-1996 parole rules.  In two later, non-precedential cases, McLaurin v. Larkins, 76 Fed.

Appx. 415 (3d Cir. 2003), and Hollawell v. Gillis, 65 Fed. Appx. 809 (3d Cir. 2003), the

Third Circuit extended Mickens-Thomas to inmates convicted of other crimes.

In the instant case Hull generally alleges that the Board likewise violated his ex post

facto rights by using its post-1996 parole criteria to deny him parole.  To the extent he seeks

monetary relief, his claim is without merit.  Hull's claim for damages is not cognizable under

---

> The value of parole as a disciplinary and corrective influence and
> process in hereby recognized, and it is declared to be the public
> policy of this Commonwealth that persons subject or sentenced to
> imprisonment for crime shall, on release therefrom, be subjected
> to a period of parole during which their rehabilitation, adjustment
> and restoration to social and economic life and activities shall be
> aided and facilitated by guidance and supervision under a
> competent and efficient parole administration, and to that end it is
> the intent of this act to create a uniform and exclusive system for
> the administration of parole in this Commonwealth.

§ 1983 unless he can demonstrate that the conviction or sentence has been previously invalidated.  See Heck v. Humphrey, 512 U.S. 477, 480, 487 (1994).

To the extent Hull seeks a new parole hearing on the basis that his prior hearings violated the Ex Post Facto clause, the undisputed record does not support such a finding. The only parole considerations in issue in the amended complaint are those in 2001 and 2002.  Pursuant to Cimaszewski v. Board of Probation and Parole, 582 Pa. 27, 868 A.2d 416 (Pa. 2005), the Pennsylvania Supreme Court held that retroactive changes in law governing parole may violate the Ex Post Facto clause if the change created a significant risk of increasing the measurement of punishment attached to the crimes.  The inmate raising the challenge has the burden to establish the significant risk that must be more than a speculative and attenuated possibility of increasing his punishment.  As such, Hull must come forward with facts showing that as a result of the change in policy there was a significant risk that his confinement would be prolonged or that the change negatively impacted his chance to be released on parole.

In the instant case, defendants have come forward with evidentiary materials which include both declarations made under penalty of perjury and supporting documents relevant to Hull's consideration for release on parole.  These documents reveal that the Board considered all matters required pursuant to the Parole Act of 1941, as amended, 61 P.S. § 331.1 et seq. when considering Hull for parole.  The Board denied parole to Hull because of his institutional behavior, including reported misconducts, and failure to complete his

institutional programming.[10]  The specific reasons given in Hull's parole denials are ones that

were appropriately considered before 1996 and merit denial of parole under any pre-1996

standard.  To the contrary, Hull has failed to produce any evidence to indicate that the Board

considered anything that created a significant risk of increasing Hull's punishment.

Accordingly, defendants' motion for summary judgment will be granted on this claim.

### 5.    Retaliation

Hull appears to raise a retaliation claim regarding the Department of Corrections

staffing and Hull's absence from the Board's parole summarization review.  To this extent,

Hull fails to set forth a claim of retaliation under the principles announced in Rauser v. Horn,

241 F.3d 330, 333-34 (3d Cir. 2001).  Based upon the foregoing discussion on due process

and pre-parole procedures, Hull is unable to establish that the conduct which led to the

alleged retaliation by various defendants was constitutionally protected.

### 6.    Exhaustion

The undisputed facts reveal that Hull's remaining allegations are unexhausted.  It is

well-established that pursuant to the Prison Litigation Reform Act (PLRA) of 1995, Pub.

L.No. 104-134, 110 Stat. 1321-71, an inmate must exhaust all administrative remedies prior

to filing a civil rights action.  See 42 U.S.C. § 1997e(a); Nyhuis v. Reno, 204 F.3d 65, 75 (3d

Cir. 2000).  Defendants have submitted the declaration of Kristen P. Reisinger, Assistant

---

[10]  For example, in the October 2002 denial, the reasons cited included Hull's refusal
to accept responsibility for the offenses committed, the recommendation made by the DOC,
Hull's unacceptable compliance with prescribed institutional programs and his need to
participate in and complete additional institutional programs.  (Doc. 70, Ex. F, Notice of
Board Decision 10/30/02.)

Chief Grievance Coordinator in the Secretary's Office of Inmate Grievances and Appeals for the Pennsylvania DOC.  (Id., Ex. E.)   The declaration and supporting documents reveal that a grievance procedure was available to Hull with regard to the remaining claims alleged in the amended complaint pursuant to DC-ADM 804.  After attempting to resolve an issue informally, an inmate is permitted to file a grievance to the Facility Grievance Coordinator.  An appeal can thereafter be pursued to the Superintendent.  The final level of appeal is to the Secretary's Office of Inmate Grievances and Appeals.

The undisputed record reveals that Hull has failed to exhaust the remaining issues in the amended complaint.  While he did submit various inmate requests and grievances via the prison grievance system, he failed to grieve or thoroughly exhaust his claims as set forth above in the statement of undisputed facts.   Summary judgment is therefore warranted in favor of defendants on all remaining claims.

**V.      Conclusion**

Based upon the foregoing, defendants' motion for summary judgment (Doc. 64) will be granted.  An appropriate Order is attached.

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DONALD R. HULL,                      :
                                             :
           Plaintiff           :
                                             :
      v.                      :    CIVIL NO. 3:CV-03-1524
                                           :
FRANK D. GILLIS, et al.,        :    (Judge Kosik)
                                           :
          Defendants      :

### **O R D E R**

_____**NOW, THIS 8ᵗʰ DAY OF AUGUST, 2006**, in accordance with the accompanying

Memorandum, **IT IS HEREBY ORDERED AS FOLLOWS:**

    1.     Defendants' motion for summary judgment (Doc. 64) is granted and judgment is entered in favor of defendants and against plaintiff on all claims.

    2.     The Clerk of Court is directed to close this case.

    3.     Any appeal from this Order will be deemed frivolous, lacking in probable cause and not taken in good faith.

                                             s/Edwin M. Kosik
                                    United States District Judge